FILED
2016 Mar-08  PM 03:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOSHUA EMERY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:14-CV-880-VEH** |
| | ) | |
| **TALLADEGA COLLEGE, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

## MEMORANDUM OPINION

This case arises out of the shooting of Joshua Emery while a student at Talladega College. The defendants, Talladega College, Billy C. Hawkins, Jacqueline W. Paddio, and Miguel A. Bonds ("Talladega" or "Defendants") have moved for summary judgment under Rule 56 against Plaintiff Joshua Emery ("Emery" or "Plaintiff"). The parties have also filed a panoply of discovery-related motions, all of which, other than Defendants' Motion to Strike Expert Testimony, will be **TERMED AS MOOT** in light of the resolution of this Motion for Summary Judgment. The Motion for Summary Judgment will be **GRANTED.** The Motion to Strike Expert Testimony will be **GRANTED IN PART AND**

**DENIED IN PART.**[1]

## MOTION TO STRIKE EXPERT TESTIMONY

Except as set out below, this motion will **DENIED**. The reason for this is two-fold. First, the motion to strike the report and testimony in their entirety is too broad, and, had the case survived summary judgment, it would have been appropriate to take up more atomistic objections to the report in advance of trial. Second, Emery only cites to the report and testimony three times as evidentiary support in his response to the motion for summary judgment, and it is unnecessary to resolve the admissibility of the report beyond those cited portions. The cited portions are:

> 72.    The assault on Plaintiff Emery did not arise out of a sudden burst of violence, but rather was the culmination of several prior assaults occurring on campus earlier that evening. Ex. C, Gaut Aff. p. 31; Ex. D. Gaut Dep. pp. 234-35.
> . . . .
> 74.    Talladega College both under-reported and mis-classified crime data in the years proceeding the shooting assault on Joshua Emery. Gaut Aff. pp. 11-17.
> 75.    Talladega College classified the shooting assault on Plaintiff Emery as a "physical injury." A

---

[1]  Emery has twice requested oral argument; once on the discovery motions and once on all motions. Defendants oppose oral argument, and the court agrees with them. The briefs in this case have been more generative of heat than light, and there is no reason to believe oral argument would be different. Further, oral argument is particularly unhelpful where, as here, the most critical issue on summary judgment is the sufficiency of the plaintiff's evidentiary submissions. Argument would only serve to delay the resolution of this 22 month-old case.

> physical injury is not required to be reported under the
> Clery Act. The Talladega City Police Department
> properly classified the injury to Plaintiff Emery as an
> "assault." Gaut Aff. p. 16; Gaut Dep. p. 292.

(Doc. 37, ¶¶ 72, 74–75).

The threshold issue for the admissibility of expert testimony and reports is Rule 702, which provides, in relevant part, that a witness who "is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will <u>help the trier of fact to understand the evidence or to determine a fact in issue</u>." FED. R. EVID. 702(a) (emphasis added). While expert opinions are technically subject to exclusion under FED. R. EVID. 403, see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Rule 702 is a more stringent barrier that allows expert opinions to be excluded when the opinion's probative value and prejudicial effect are in equipoise, so the Rule 403 analysis is (as a practical matter) within the Rule 702 analysis. *See* 29 CHARLES ALAN WRIGHT AND VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 6263 at 196 (1997).

Defendants move to strike the expert testimony because it fails, they allege, to satisfy Rule 702 and, in the alternative, should be excluded under Rule 403 anyhow. For the reasons above, the court only conducts the Rule 702 analysis. The

3

Eleventh Circuit has refined the Rule 702 analysis somewhat to require that the trial court consider, first, whether "the expert is qualified to testify competently regarding the matters he intends to address," second, whether his methodology satisfies *Daubert*, and third, whether the testimony would assist the trier of fact, through specialized expertise, to understand the evidence or to determine a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

As to paragraphs 74 and 75, Gaut is clearly qualified. His background in law enforcement gives him experience sufficient to consider proper protocols for the reporting of crimes. Because this opinion is a deeply factual one, it could easily be undercut by cross examination if it were untrue, so the touchstone of *Daubert*, reliability, is satisfied. Finally, this information would assist the trier of fact in determining the Defendants' mental state as to Emery's fraud claims. The motion is **DENIED** as to paragraphs 74 and 75.

Paragraph 72 is a different story. The court is unwilling to assume that Dr. Gaut—or anyone—is qualified to render such an opinion, but the short explanation for why it should be excluded is that it would not assist the trier of fact because it does nothing but make Emery's closing argument for him. *See Frazier*, 387 F.3d at 1262–63 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing

arguments."). Further, as will be discussed *infra*, there is almost no evidence to support this opinion; it is "rank speculation." *See* 29 CHARLES ALAN WRIGHT AND VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 6924 at 226–27 & n. 45 (1997) (collecting cases). The motion to strike is **GRANTED** insofar as Dr. Gaut's opinion is used to support the facts in Paragraph 72.

## MOTION FOR SUMMARY JUDGMENT

Emery asserts four claims against the Defendants. Count I, against Talladega College, alleges that Talladega College negligently or wantonly failed to provide for his safety, resulting in his shooting injury. Count II, against Talladega College, Hawkins, and Paddio, alleges promissory fraud on the basis of those defendants' promise, and subsequent failure, to pay Emery's medical bills after the shooting. Count III, against Talladega College and Bonds, alleges that they deceived Emery and thereby harmed him by telling him he could study engineering and play in the band at Talladega College. Count IV, against all defendants, alleges that they concealed information about the true prevalence of crime and violence from prospective students. Defendants move for summary judgment as to all counts.

## I.   **FACTUAL BACKGROUND**[2]

A New Orleanian, Emery enrolled as a freshman at Talladega College in August 2012. (Emery Dep. 59:16-22; 60:9-23; 70:1-2). Prior to enrollment, Miguel Bonds offered Emery a $2,000 band scholarship to attend Talladega College. (Emery Dep. 39:18–23). At the time of enrollment, Emery wanted to major in engineering because he likes to use his hands, and he had an interest in cars. (Emery Dep. 45:2–8). Talladega College does not offer an Engineering Program, Bonds Dep. 34:20–35:2, but Emery was informed that they had such a program at the time he enrolled and only learned the truth a few months after enrollment. (Emery Dep. 69:14–70:10).

Additionally, Bonds informed Emery before enrollment that the crime rate in Talladega was "not that high." (Emery. Dep. 242:18–22). Similarly, Bonds responded to a question from Sherida Emery, Joshua Emery's mother, about the safety of campus by saying "it's pretty safe." (Sherida Dep. 40:20–22). Bonds also described Talladega as a "friendly area" and a "little hick town." (Sherida Dep. 40:13–17).

_____

[2] The following recitation of facts was created by first, reciting all undisputed facts, second, discarding disputed facts that are not supported by citations to the record, third, resolving factual disputes that are evidentiarily unambiguous in the manner supported by the record, and fourth, resolving factual disputes that are evidentiarily ambiguous in favor of Emery, the non-movant.

On October 12, 2012, near "The Inn," Emery Dep. 195:4–15, while Emery and two other Talladega College band members were walking on a campus sidewalk to meet other students for "activities at the campus chapel," Emery observed "three people [he] walked past." (Emery Dep. 87:13–14). He "looked" and "didn't recognize them, so" he "turned [his] head." (Emery Dep. 87:15–16). "[O]ne of them was looking at [Emery] kind of strange like he had a problem." (Emery Dep. 87:16–18). Emery kept walking because "they had a bottle sitting next to them." (Emery Dep. 87:19–21). Emery and his friends proceeded to the chapel without incident. (Emery Dep. 87:22–88:2).

After stopping at the chapel, Emery returned to see "the three people are still sitting there. One of them looking at me like, like he's mad or something." (Emery Dep. 88:3–6). Emery said "what's up?" to the individual, to which the individual replied, "what's up, what you mean, you want to fight?" (Emery Dep. 88:7–9). Emery then said to the individual, "What you want to do then," but the individual's friends grabbed the individual and said "we're not on that." (Emery Dep. 88:10–12). Emery walked off, and the three individuals, who Emery characterized as "locals," began to follow him, Emery Dep. 88:13–17,[3] "cursing and

_____

[3] The parties dispute whether Emery was the first to suggest fighting, and the record supports both readings. *Compare* Emery Dep. 170:17–22 *with* Emery Dep. 88:7–9. The court will read the facts as Emery urges. *See Beard v. Banks*, 548 U.S. 521, 529 (2006) ("[A]t this stage we must draw all justifiable inferences in [the non-moving party's] favor.") (citation and

threatening." (Emery Dep. 195:10–15).

As he walked off, Emery became afraid, so he called a bandmate over. In response to his call, "a crowd" of other Talladega College students ran to the Inn and joined Emery. (Emery Dep., 165:7-13) The locals, as they followed, were still "riled up," and the individual who had previously asked Emery to fight was "rah-rahing up at the mouth." (Emery Dep. 88:21–23; 89:1). Emery asked the local if he wanted to fight, and the local's friends again said "we're not on that." (Emery Dep. 89:2–4). One of the locals then made a phone call, and shortly thereafter someone pulled up in a Black Dodge Charger with a license plate that said "ColbyD." (Emery Dep. 89:4–7).

The driver ("ColbyD") exited the vehicle with his hand in his pants; he removed his hand, and he was holding a bottle that he subsequently placed into the car. (Emery Dep. 89:10–15). He then reached into the car, retrieved a gun, and stuck it into his pants. (Emery Dep. 89:16–18). Everyone "kind of backed up," but a campus police car passed by, and the locals piled into the Charger with ColbyD and drove off. (Emery Dep. 89:19–23).

Seeing the crowd of people, the campus police stopped and asked the students what was happening. (Emery Dep. 90:1–3). Emery and the other students

---

quotation marks omitted).

told the Talladega College police officer that the Dodge Charger that had driven away had a gun in it. (Emery Dep. 173:7-17; 90:6-9).

After Emery told the Talladega College police officer that the car had a gun in it, Emery walked to two local stores, Geneva's and Westco, which were off campus. Emery first walked to Geneva's, which was closed, and then to Westco. (Emery Dep. 90:10-15). At Westco, Emery spoke to a campus police officer who had pulled up. (Emery Dep. 90:14–15). Emery described the individual who had earlier "pulled a gun out on [Emery]" and said that he was parked at "this little place called the Super 10," another store that was not on the Talladega College campus. (Emery Dep. 91:4–9). The Talladega College police officer told Emery to walk back toward campus. (Emery Dep. 91:4-14).

I need to briefly pause the recitation of facts. While Emery's <u>counsel</u> asserts that there was a second altercation between the people in the Charger and "certain Talladega College students," <u>Emery himself</u> disclaims any knowledge of the assertion or facts supporting it. The citations provided to support this second altercation allegation are Emery's unverified complaint, which is not proof of a fact, *Wright v. Farouk Systems, Inc.*, 701 F.3d 907, 911 n. 8 (11th Cir. 2012), and Emery's deposition. While Emery notes in his brief that he was not "present or involved" in this second altercation, his deposition puts the matter more strongly.

9

There, Emery expressly disclaimed knowledge of the second altercation and admitted that the first time he had heard of it was when he saw what his lawyer had written in the complaint. (Emery Dep. 198:11–199:18). This second altercation is therefore insufficiently substantiated to constitute a "fact" for purposes of summary judgment.

And now, a return to the narrative. The walk from Westco back to campus was peaceful—mostly. (Emery Dep. 108:12-15). Emery, along with three of his bandmates, had nearly reached their dormitory, Crawford Hall, when "some dudes" ("dudes") jumped out from behind a church. (Emery Dep. 91:17–18). The dudes "rah-rah[ed] off at the mouth, curs[ed] [the students] out, call[ed] [the students] all these names." (Emery Dep. 91:19–22). In response, Emery and another student "said something," but the students then decided to just proceed to Crawford Hall "before [they] got jumped." (Emery Dep. 91:23–92:7).

The dudes followed Emery and his bandmates at "[a] good little distance," Emery Dep. 113:2, cursing the students all along, Emery Dep. 112:1, but the dudes did not reach Crawford Hall until after the students had stepped inside. (Emery Dep. 112:5–7). After Emery and the other Talladega College students closed the door to Crawford Hall, some of the dudes began to try to enter Crawford Hall. The students prevented the non-students from entering Crawford Hall. (Emery Dep.

10

98:11-17; 99:4-7). One dude tried to "snatch the door open," but one of the students kept it shut. (Emery Dep. 98:3–5).

As some point (Emery does not know when or how), the door to Crawford Hall was opened. (Emery Dep. 99:2–3). Feeling that he had to defend himself, Emery Dep. 99:19–100:1, Emery exited Crawford Hall, descended the steps of Crawford Hall toward the street, and struck one of the dudes at the bottom of the front steps to Crawford Hall. (Emery Dep. 99:12-14). Emery then began"fighting random people," Emery Dep. 101:12-18, and the fracas spilled into the street. (Emery Dep. 99:15–17). There is no evidence any guns were involved in this fight. (Emery Dep. 79:12–81:10 78:19-20; 86:5-15). Emery did not know who he was fighting. (Emery Dep. 86:14–23).

Officer Lindsay, a Talladega College police officer, arrived at the scene of the fight and broke up the fight using mace or other deterrent spray and disbursed the students and the dudes. (Emery Dep. 92:19-23). Lindsay told Emery to relax (Emery Dep., 104:5-7). Lindsay then told Emery and the other Talladega College students to get back inside Crawford Hall. Officer Lindsay personally escorted Emery back inside Crawford Hall. (Emery Dep., 203:20-23; 204:1-4). Lindsey also instructed Emery and the other Talladega College students to stay near the dorm area. (Emery Depo., 204:5-9).

11

Lindsay left the students in the custody of Isaiah Carter, the Crawford Hall

Dorm Director. Lindsay thereafter began to search for the dudes. (Lindsay Aff. ¶

13). Carter kept Emery and the other students inside Crawford Hall after the fight

for some period of time. Emery estimates this to have been about 5 minutes.

(Emery Dep. 80:22-23; 81:1-4). The school was not placed on "lock down" during

this time, Paddio Dep. 121:20–122:2, although there was an informal "lock out."

Talladega College campus was not equipped to be locked down, nor was there a

mass communication system. (Chief Jefferson Walker Aff. ¶ 7). The students were

then allowed onto the front porch of Crawford Hall, although Lindsay had not yet

apprehended anyone. (Lindsay Aff. ¶ 13). Around this time, Lindsay saw someone

running between MLK and Savory Streets. (*Id.*).[4]

Between 5 and 10 minutes after the students were allowed to exit the

lobby of Crawford Hall to sit on the front porch, shots were fired from a location

off campus across Martin Luther King Drive from Crawford Hall. Emery was the

only person injured; he was struck in the abdomen by one of the shots. Emery did

---

[4] Emery, in his complaint and brief, alleges that an additional violent altercation occurred around this time at a gas station. (Doc. 1, ¶ 45; Doc. 37, ¶ 62). As support for the incident's occurrence, he cites to Emery's deposition in which Emery claims he heard a rumor about this altercation. (*See* Emery Dep. 205:8–207:16) He also cites to Officer Lindsay's affidavit, which says nothing about this incident. Emery further alleges that there was "yet another" incident to which Lindsay responded. (Doc. 37, ¶ 63). Emery cites to Officer Lindsay's affidavit as proof of "yet another" fight, but the affidavit says nothing of the sort.

not see the shooter prior to the shooting incident, and does not know the identity of the assailant. (Emery Depo. 181:4-5).[5] Emery testified that he saw a single individual walk past Crawford Hall after the fight and before the shooting, but there is no evidence that this person had a gun or was the shooter. (Emery Dep. 177:22-23; 178:1-13). There is no evidence that the assailant was an employee, officer, or agent of Talladega College or any of the individually-named Defendants.

While Emery was being treated, Paddio informed Sherida Emery that "you and Joshua have nothing to worry about, all expenses, medical bills and anything pertaining to this incident, the school will cover." (Sherida Dep. 72:4–8). Hawkins "piggybacked" what Paddio had said, reiterating "the school is going to cover all expenses." (Sherida Dep. 72:10–12). Paddio later repeated the guarantee in her office to Sherida Emery. (Sherida Aff., ¶ 4). The medical bills were incurred as a necessity. On June 17, 2013, Talladega employee Gerald J. William advised in

---

[5] Emery asserts that there is both evidence that the people in the Charger were involved in the shooting, doc. 37, ¶ 12, and that the list of suspects for the shooting has been narrowed, *id.*, ¶ 2. He cites no evidence as support for these propositions, so the court disregards them.

writing that Talladega College "paid up to its limits." (Williams Letter).[6, 7]

After the shooting, Talladega College President Billy Hawkins stated "there has been an ongoing problem with locals coming onto campus with guns ... and that [Talladega College's] chief (of campus police) has taken a lot of guns off locals on campus." (Aziza Jackson Aff., ¶ 5).[8] Chief Jefferson Walker later characterized the physical altercations and threats made to students preceding the shooting as posing "an imminent threat and danger to student safety." (Walker Aff., ¶ 5). Officer Lindsay offered the same characterization. (Lindsay Aff., ¶ 4). Emery's shooting was reported as a physical injury, which does not trigger the Clery Act's reporting requirements. (Gaut Rep. at 16). Talladega College had been misreporting the amount of crime on campus for years. (Gaut Rep. at 11–17).

Emery returned to the Talladega College campus and enrolled for the Spring semester in January 2013. He completed that semester and enrolled again in the

---

[6] This piece of evidence appeared in a footnote in the argument section of Emery's response brief. A fact's first appearance should not be in a footnote in the argument section. Failing to initially recite facts in the factual sections of the brief—as required by the Uniform Initial Order, doc. 3 at 17–18—undermines the "just, speedy, and inexpensive determination of every action." FED. R. CIV. P. 1.

[7] Emery goes on to complain that no payments were ever made and that he incurred substantial costs in the form of damaged credit, etc. He has cited no evidence as proof of this, so the court disregards it.

[8] Defendants argue that this statement is inadmissible hearsay. It is not. *See* FED. R. EVID. 801(d)(2)(C)–(D).

Fall semester of 2013. Emery continued as a Talladega student, despite knowing that Engineering was unavailable as a major, so that he could get his minor coursework out of the way, and so he could learn to read music in the band. (Emery Dep. 242:1–7). Because he did not currently have a major, he selected music as his major after he was shot. (Emery Dep. 187:14–188:13).

There is a final factual matter to discuss. Emery's "Additional Disputed Facts" found in his response brief, doc. 37, ¶¶ 69–76, have been partially included in the above recitation of facts. In a footnote in their reply brief, doc. 44 at 5 n. 2, Defendants moved to strike the "Additional Disputed Facts" on several grounds, including non-compliance with the court's Uniform Initial Order. In particular, Defendants noted that the Uniform Initial Order requires "Disputed Facts" to include record citations supporting and undermining the contentions, doc. 3 at 18, and Emery only included supporting citations. True enough, but moving to strike in a footnote in a reply brief is also improper; a motion to strike should be filed separately to allow adequate briefing of the issue from all parties.

Further, the court declines to discount the "Additional Disputed Facts" on the basis of Emery's failure to include undermining citations, because the record citations clearly support the facts as stated. This is not to say that the "Additional Disputed Facts" were automatically considered undisputed. Paragraphs 70, 71, and

15

76 were already included within the recitation of facts. Paragraphs 69 and 73–75 have been included as undisputed facts. Paragraph 72 has been excluded as described above.

## II.   <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine

issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249 (internal citations omitted).

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.*

17

(citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (citation omitted).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16 (citation omitted). First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17 (citation omitted). When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citation omitted). The second method a movant in this position may use to discharge its burden is to provide affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering evidence sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

III.   **ANALYSIS**

A.    Third-Party Criminal Acts (Talladega College)

"In Alabama, the existence of a duty is a strictly legal question to be determined by the court." *Bryan v. Alabama Power Co.*, 20 So.3d 108, 116 (Ala. 2009) (quoting *Taylor v. Smith*, 892 So.2d 887, 891 (Ala. 2004)). "It is the general rule in Alabama that absent special relationships or circumstances, a person has no duty to protect another from criminal acts of a third person." *Collins v. Scenic Homes, Inc.*, 38 So.3d 28, 32 (Ala. 2009) (citation and quotation marks omitted). The court will discuss these alternative avenues of establishing Talladega's duty in turn.

1.    Special Circumstances

To establish that special circumstances exist sufficient to give rise to a duty to protect against third-party violence, Alabama law requires a plaintiff to prove three elements. "First, the particular criminal conduct must have been foreseeable. Second, the defendant must have possessed specialized knowledge of the criminal activity. Third, the criminal conduct must have been a probability." *Tenn Tom Bldg. v. Olen, Nicholas, & Copeland, P.C.*, 908 So. 2d 230, 233 (Ala. 2005) (citation and quotation marks omitted).

The elements blend into each other to an extent, but it appears they are

designed to work like a series of ever finer sieves. Thinking of it this way, the questions become: First, which criminal conduct are we talking about, and based on all the information in the universe, was <u>that crime</u>, foreseeable? *See*, *e.g.*, *New Addition Club, Inc. v. Vaughn*, 903 So. 2d 68, 73 (Ala. 2004) (the fact of a previous battery is not probative of the foreseeability of murder). Second, accepting that the conduct was foreseeable, did the <u>defendant</u> have enough knowledge to foresee it? *See*, *e.g.*, *Carroll v. Shoney's, Inc.*, 775 So. 2d 753, 757 (Ala. 2000) (no employee of Captain D's had any knowledge that husband would enter the restaurant and kill his wife). Third, if it was foreseeable and he knew about it, was it probable enough to create a duty to do something about it? *See*, *e.g.*, *Tenn Tom Bldg*., 908 So. 2d at 234–35 (knowledge that a building would burn easily did not make arson probable). If the answer to any of the questions is no, then the claim fails as a matter of law.

Starting with the first element, the parties disagree about the level of generality at which the "particular criminal conduct" must be cast. Emery argues that a battery[9] of any severity must be the crime foreseen, whereas Talladega urges that a shooting—and only a shooting—will do. The true rule falls somewhere in between. The Alabama courts appear to conduct the analysis gazing through the

---

[9]  Emery actually says "assault," but the label is immaterial.

common law lens, *see Vaughn*, 903 So. 2d at 76, rather than saying, for instance, that the defendants must have foreseen that the malefactor would violate a particular section of the Alabama criminal code. In terms of common law crimes, the evidence reveals some assaults and batteries in the fight outside of Crawford Hall and a battery against Emery when he was shot. It is not particularly difficult to conclude, as a general matter, that a subsequent battery is foreseeable based on a previous one, so that is a point in favor of Emery's theory.

The court will briefly detour from her legal analysis to explain why she does not consider the events outside The Inn to constitute common law assault or battery, nor, to the extent they are relevant, Alabama assault, ALA. CODE §§ 13A-6-20–22, or menacing, *id.* § 13A-6-23. There is no evidence that anyone touched anyone else during the events at The Inn, *see* Emery Dep. 208:12–18 (Emery admits that the confrontation at The Inn was not a fight), so battery and Alabama assault are off the table. At common law, it was well-settled that mere words are insufficient to constitute assault. *See, e.g.*, *Holcombe v. Whitaker*, 318 So. 2d 289, 294 (Ala. 1975). The same is true for the Alabama menacing statute. *Lansdell v. State*, 25 So. 3d, 1169 (Ala. Crim. App. 2007). It is unlikely that the events that transpired, including Emery and the disgruntled man asking each other if they wanted to fight, created sufficient imminence to qualify as common law assault.

The court can locate no Alabama decision in which leering at a person, following him, and asking if he wanted to fight constituted menacing. Finally, there is no evidence that ColbyD ever engaged or spoke to the students. Merely observing that an individual possesses a weapon is insufficient to constitute common law assault or menacing as a matter of law. *See Ex parte Pate*, 145 So. 2d 733 (Ala. 2013) (retrieving shotgun and pointing finger at victim insufficient). This conclusion is not disturbed by Emery's repeated characterization of ColbyD as "threatening" the students and "brandishing" the gun; "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).[10]

Back to the level of generality. Emery's position becomes difficult to maintain as the disparity in violence between battery 1 and battery 2 grows. The problem arises because Emery appears to argue that, as long as two crimes have the same archetype, the second one is foreseeable. However, crimes can be subject multiple characterizations. Here, the shooting could be a battery or it could be attempted murder. It is well-settled in Alabama that a previous assault and battery is insufficient to make a subsequent murder foreseeable, *see*, *e.g.*, *Vaughn*, 903 So.

_____

[10]   Decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

2d at 76, so Emery's approach would have the foreseeability of the crime end up turning on what it is called after the fact. That is not good. But to see exactly how problematic Emery's approach can become, a hypothetical is helpful:

A shooting occurs following a series of brawls, and the victim is on life support. A civil action is initiated against the owner of the premises on which the shooting occurred, and it clears summary judgment because a subsequent battery was the foreseeable consequence of the previous. Shortly before trial, the victim dies. The battery merges into the new crime of murder, and the previously foreseeable crime is now unforeseeable.

So, there must be some limitation on the foreseeability of a more violent form of the same crime when the difference in degree is so large as to be a difference in kind. Emery's "categorical approach," to borrow a phrase, *see Descamps v. United States*, 133 S. Ct. 2276 (2013), is therefore inapposite, but so is Talladega's shooting-or-nothing approach;[11] they are both too rigid.

Whether you call it battery with a deadly weapon or attempted murder, the

---

[11] Again, a hypothetical may illustrate the problem. A battered wife checks into a hotel and informs the hotel clerk that she is hiding from her husband, who will shoot her (he said so) if he finds her. The husband comes looking for the wife, and the clerk gives him a key to the room. The husband enters the room and shoots at the wife, but the gun jams. Instead, the husband strangles her to death. The clerk would be unable to defend (under Alabama law) that the killing was unforeseeable, *see Thetford v. City of Clanton*, 605 So. 2d 835, 838–40 (Ala. 1992), but that is what Talladega's approach would compel if the particular manner of a crime were required to be foreseen.

shooting was not a foreseeable consequence of a brawl in which no weapons were observed,[12] because the seriousness of the crimes are too dissimilar. This case is all-but controlled by *Vaughn*; there, a patron murdered a woman at a nightclub, after the murderer had previously punched his girlfriend in the club's parking lot and brandished a shotgun there before. 903 So. 2d at 75–76. Despite indicia that the killer in that case could be expected to be armed and violent, the court held that the killing was not foreseeable. *Id.* There is less evidence here to suggest that a shooting would occur than there was in *Vaughn*, so the shooting was not foreseeable.

Finally, all of the foregoing discussion on foreseeability has been premised on the idea that the same party batters once and then batters again—a proposition unsupported by the evidence in this case. Where the beaters are different, or at least not certainly the same, the probative value of the earlier battery is reduced vis-à-vis foreseeability; it is difficult to see why being battered by one person makes it foreseeable that another person will randomly batter you later. But the parties

---

[12]   Emery argues that Defendants have introduced no evidence showing that there was no gun at the brawl. While *argumentum ad ignorantiam* is the source of some consternation in philosophical circles, the law deals with the fallacy by placing the burden of proof on the plaintiff and (usually) leaving it there, requiring <u>him</u> to prove the existence of critical facts at the peril of losing his case. *See Fitzpatrick*, 2 F.3d at 1116. But, if it would put his mind at ease, Emery is reminded that he admitted in his deposition that the only gun <u>he</u> saw that night was ColbyD's. (Emery Dep. 208:19–23).

appear to agree that the identity of the shooter goes to the requirement of

Talladega's specialized knowledge, so the court will briefly delay this discussion.

The second element, as discussed above, appears to bear on whether

Talladega knew this criminal would attack this defendant. *See Daily v. Housing

Auth.*, 639 So. 2d 1343, 1347 (Ala. 1994). The most significant disagreement

between the parties is the extent to which the shooter's identity must be narrowed.

Emery also argues that, because the police officers described the brawl as an

imminent threat to student safety and the students informed the police that the

driver of the Charger had a gun, Talladega had the requisite knowledge. The

second of these contentions is more appropriately directed to the third element,

probability, so I will take it up there.

As to the issue of the shooter's identity, both parties quote from *Hail v.*

*Regency Terrace Owners Ass'n*, 782 So. 2d 1271 (Ala. 1999) to support their

respective positions. Here is the relevant portion:

> [Defendants] argue that the fatal fire was not foreseeable.
> However, this argument is contradicted by evidence of
> the significant steps the Association had taken in its
> attempts to protect the residents from the danger of future
> fires. The evidence in the record indicates that the
> [defendant] had held educational meetings, had installed
> new fire equipment, and had added additional security
> devices. It had decided to install surveillance cameras not
> only near the trash chutes, where the previous fires had
> occurred, but in the lobby area as well. These cameras

were being installed, but were not operational, at the time of the fatal fire.

In the cases where this Court has held a defendant subject to liability under a theory of premises liability for the criminal acts of a third party, the identity of the third party was known to the defendant. *See Nail v. Jefferson County Truck Growers Ass'n, Inc.*, [542 So.2d 1208, 1211 (Ala.1988)] (involving two sets of feuding tenants, their identities known to defendant); *Thetford v. City of Clanton*, [605 So.2d 835, 840 (Ala.1992)] (innkeeper warned by wife that husband should not be told of her presence on innkeeper's property); and *Young v. Huntsville Hospital*, 595 So.2d 1386 (Ala.1992) (anesthetized patient sexually assaulted by a person who had been seen wandering around the hospital on prior occasions). In this case, while the identity of the arsonist is not known, the number of suspects had been narrowed to two. [Defendants] argue that one could only speculate as to which of the two persons was the culprit, and that the trial court, therefore, properly entered their summary judgments. However, that argument glosses over the question whether the steps taken by [Defendants] to investigate and to identify and remove the wrongdoer, so as to end a 13–month–long series of arson fires, were reasonable under the circumstances. In this respect, this case is distinguishable from cases such as *Saccuzzo v. Krystal*, [646 So.2d 595, 596 (Ala.1994)]; *Ex parte McRae's of Alabama, Inc.*, [703 So.2d 351 (Ala.1997)]; and *Ortell v. Spencer Companies*, [477 So.2d 299 (Ala.1985)]. In those cases, the element of foreseeability was lacking, as a matter of law, notwithstanding the fact that in each of those cases the evidence indicated numerous prior criminal incidents on or around the defendant's premises; in each of those cases, the defendant had no evidence suggesting the identity of the third person committing the criminal acts and the plaintiff made no claim that the defendant had not used due diligence in attempting to identify that person.

*Id.* (emphasis added). *Hail* stands for three propositions: 1) there is no "special circumstances" duty where the criminal's identity is completely unknown; 2) there is a "special circumstances" duty when the criminal's identity is narrowed to one of two people; and 3) taking precautionary measures against the third-party crime for which you are being sued is pretty good evidence that you foresaw it.

Here, there is no evidence at all about who shot Emery. "Au contraire," says Emery; the shooter was narrowed to the group of people in the Charger, and it was the same group of "Locals" throughout the night who harassed the students. Aside from his habit during briefing to refer to the crowd at The Inn, the church, Crawford Hall, and the shooter as "Locals," Emery has offered **nothing**, especially not admissible evidence, to demonstrate that the locals and the dudes were in fact local dudes; that is to say, the same people. Even the number of assailants at Crawford Hall, to say nothing of their identifies, is uncertain. (*See* Emery Dep. 97:8–15). And Emery knew how to say it when he saw the same person. (*See* Emery Dep. 88:3–6)

Anyway, Emery also points out that Lindsay pepper-sprayed a "Local," and Lindsay was trying to apprehend the assailants when Emery was shot. So what? If there were evidence, not allegations in a brief, that one of the people outside Crawford Hall was ColbyD, then Lindsay's awareness of the sprayed person may

27

have been significant, but as is, it shows the college knew there was a brawl, not that it knew there would be a shooting.

Two Talladega College Police Officers described the brawl as "an imminent threat to student safety." Brawls often have that characteristic. Of course, the fact that the brawl posed a threat to student safety says nothing about the foreseeability of the shooting (or even the brawl). And a crime that was otherwise unforeseeable does not become foreseeable simply because it has started but not yet concluded. *Cf. Virginia v. Peterson*, 749 S.E. 2d 307, 313 (Va. 2013) (Virginia Tech had no duty, during Seung-Hui Cho's rampage, to warn students about a not-yet apprehended shooter whose identity was unknown after discovering his first victim).

Finally, as to probability, Emery offers no record citations, just saying that Emery was the target of a coordinated attack. Perhaps it is beating a dead horse to say so, but a plaintiff has to prove his case. No evidence has been introduced to demonstrate that the "Locals" were the same people as the riders in the Charger; no one knows who the shooter is. Emery cannot sustain his negligence claim on the "special circumstances" theory. *See also Wilder v. Sigma Nu Fraternity, Inc.*, 390 F. App'x. 910, 912–13 (11th Cir. 2010) (finding no duty where the criminal <u>actually</u> brandished a weapon).

28

2.      Special Relationship

Defendants suggest that the court should analogize to actions under 42

U.S.C. § 1983 to determine whether a special relationship exists under Alabama

law. They reason that, as a consequence of Alabama's provision of immunity from

state law tort actions to school boards, there is not a lot law on the subject of

students injured by third parties at school, so section 1983 is better than nothing.

The court is skeptical of the relevance of section 1983 to a negligence action, since

section 1983 is a "unique remedy," *Wilson v. Garcia*, 471 U.S. 261, 272 (1985),

*superseded on other grounds*, that is, if analogous to any state law cause of action

at all, most like the intentional torts. *See Owens v. Okure*, 488 U.S. 235, 248 (1989)

(describing intentional torts as "most analogous to § 1983 claims," but noting the

analogy is "imprecise"). *But see Heck v. Humphrey*, 512 U.S. 477, 484 (1994)

(drawing on common law malicious prosecution for elements of section 1983

action seeking damages for an unconstitutional conviction). Taking account of

section 1983's *sui generis*[13] nature, the court is uncomfortable drawing on that body

of law for inspiration in this case.

Emery, for his part, argues that a special relationship is created when a party

———————————

[13]  Well, almost. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
403 U.S. 388 (1971); *Ashcroft v. Iqbal*, 556 U.S. 662, 675–76 (2009) (describing *Bivens* as the
federal analog to suits under section 1983 against state officials).

29

takes "custodial control" of another. That may be, and it would jibe with the court's intuitions, but flattering the court's hunches is not enough to make law. Alas, Emery offered no Alabama law to support his position—not even an Alabama definition of custodial control. Instead, Plaintiff recited the facts of the case and laconically asserted that "when Defendant took custodial control of the students during the "lock out," Defendant had a ***duty to protect*** the students." (Doc. 37 at 27) (emphasis in original). It is difficult to tell whether that statement is deontological or legal.

Citing section 315 of the Restatement (Second) of Torts,[14] Emery suggests that, as a matter of logic, because a person in police custody has a right to be protected by the officer, a student dorm resident is owed the same protection from a dorm manager during a "lock out." The logic required to make this leap eludes the court, but it appears that a premise of Emery's position is that the students were placed in custody because the students were "ordered" to go into Crawford Hall after the brawl and "required" to remain in the dorm for a period of time. Emery does not explicitly say so, but it seems this line of argument is designed to evoke the standard for seizure of a person, *see California v. Hodari D.*, 499 U.S. 621

---

[14]  "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . (b) a special relation exists between the actor and the other which gives to the other a ***right to protection***." RESTATEMENT (SECOND) OF TORTS § 315 (emphasis Emery's).

(1991) (a person may be seized by force or by submission to a show of lawful authority). To the extent it is Emery's desire that the court apply this rule of criminal procedure to establish "custody," she declines to do so. If the state of Alabama (whose law governs this case) has incorporated these standards into its law of torts, Emery should cite authority to that effect.

With an unpersuasive analogy from Talladega College and an *ipse dixit* from Emery, the court has gone hunting for Alabama authority. I present my quarry: The existence of a special relationship in Alabama "hinge[s] on dependence or mutual dependence among the parties," *Young v. Huntsville Hosp.*, 595 So. 2d 1386, 1388–89 (Ala. 1992) (citation and internal quotation marks omitted); *i.e.*, where the plaintiff is "uniquely," *Sacuzzo v. Krystal Co.*, 646 So. 2d 595, 597 (Ala. 1994), and "completely," *Finley v. Patterson*, 705 So. 2d 826, 828 (Ala. 1997), dependent upon the defendants for protection. This is a very high bar, and it appears that the Alabama Supreme Court has only twice found that a special relationship exists. First, in *Young*, a special relationship existed where a patient was sexually assaulted while sedated, because she was unable to care for herself. 595 So. 2d at 1388–89. Second, in *Thetford v. City of Clanton*, 605 So. 2d 835, 838–40 (Ala. 1992), the court found a special relationship existed where a battered wife informed an innkeeper that she was fleeing her husband, she checked in under

31

a false name, requested that the innkeeper not reveal her location, but the innkeeper ultimately cut the lock off the door to allow the husband access. The wife was later beaten to death. *Id.*

The facts of this case fall far short of *Thetford* and *Young*; Emery was an able-bodied young man who was neither hiding from a pursuer nor incapacitated. He even brawled with a number of dudes because he had to "defend himself," an act that is antithetical to the existence of a special relationship. Further, the Alabama court has repeatedly held that there is no relationship-based duty for a daycare to protect children from third party criminal acts. *See Hargrove v. Tree of Life Christian Day Care Center*, 699 So. 2d 1242 (Ala. 1997) (kidnapping); *N.J. v. Greater Emanuel Temple Holiness Church*, 611 So. 2d 1036 (Ala. 1992) (rape). If taking care of young children in daycare does not create a special relationship, then housing college undergraduates certainly does not. The motion for summary judgment will be **GRANTED** as to the negligence/wantonness claim.

B.    Promissory Fraud (Talladega College, Hawkins, and Paddio)

A promissory fraud claim "is one based upon a promise to act or not to act in the future." *Southland Bank v. A & A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1210 (Ala. 2008). The elements of such a claim are:

> (1) a false representation (2) of a material existing fact
> (3) reasonably relied upon by the plaintiff (4) who

> suffered damage as a proximate consequence of the
> misrepresentation . . . (5) proof that at the time of the
> misrepresentation, the defendant had the intention not to
> perform the act promised, and (6) proof that the
> defendant had an intent to deceive.

*Id.* (citation omitted). Defendants argue that the claim fails because Emery has failed to produce evidence supporting Defendants' scienter, Emery's damages, and that Emery relied on the promise.

The court agrees with Defendants as to the reliance element. Assuming *arguendo* that a person could be defrauded on the basis of a gratuitous promise,[15] nothing appears in the facts indicating that Emery <u>relied</u> on Defendants' alleged misrepresentations. For Emery to prove reliance, "he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation." *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 5 (Ala. 2004). Nothing in the facts reflects that Emery declined to pay his bills when he would otherwise have, nor that he sought medical treatment as a result of the promise to

---

[15]   The only Alabama court to even note the issue declined "to consider whether it is actionable fraud to fail to perform an apparently gratuitous promise for which he had no legal obligation." *Fuqua v. Barbe*, 376 So. 2d 202, 204 n. 1 (Ala. Civ. App. 1979). A Yale Law professor and a practitioner in 2004 observed that they were unable to find any court that had found promissory fraud, based on a gratuitous promise, to lie. Ian Ayres & Gregory Klass, *Promissory Fraud Without Breach*, 2004 WIS. L. REV. 507, 523 (2004). Also, the category of people who <u>reasonably</u> rely on gratuitous promises may be a null set. *See id.* at 524 n. 54.

33

pay. Emery claims in his brief that he sought additional medical treatment and did not arrange for a method of payment, but he cites to no evidence of this. Additionally, Emery agreed that the medical expenses he incurred were a necessity. (*See* Doc. 28, ¶ 36 (Emery did not contest this)). Since the reliance element is not established, the motion will be **GRANTED** as to this claim.

### C.    Deceit (Talladega College and Bonds)

To establish fraudulent misrepresentation,[16] "there must be proof (1) of a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance." *Harrington v. Johnson-Rast & Hays Co.*, 577 So. 2d 437, 439 (Ala. 1991). Defendants' only argument supporting summary judgment is that Emery has not offered evidence that he suffered an injury proximately caused by their misrepresentation. The injuries the parties appear to fight over are the shooting itself, the medical bills, and, those things aside, whether Emery has been damaged at all by attending the college.

The alleged deceit did not proximately cause the shooting. *Cf. Ex parte Wild*

---

[16] "Fraudulent misrepresentation is different from fraudulent suppression." *Ex parte Dial Kennels of Ala., Inc.*, 771 So. 2d 419, 422 (Ala. 1999).

*Wild West Social Club, Inc.*, 806 So. 2d 1235 (Ala. 2001) (a beating by a security guard outside a bar is not a foreseeable consequence of ejecting someone from a bar). *A fortiori*, it did not cause the medical bills. In his brief, Emery suggests that he enrolled at Talladega College, paid tuition, and incurred student loan debt for which he is now in collections. He cites no evidence to support any of these allegations. Summary judgment will be **GRANTED** as to this count.

D.   Suppression/Concealment (All Defendants)

To make a claim for fraudulent suppression, Emery must prove that "(1) the defendant had a duty to disclose an existing material fact; (2) the defendant concealed or suppressed that material fact; (3) the defendant's suppression induced the plaintiff to act or refrain from acting; and (4) the plaintiff suffered actual damage as a proximate result." *Coilplus-Alabama, Inc. v. Vann*, 53 So. 3d 898, 909 (Ala. 2010). Defendants argue that they were under no duty to disclose the crime information to Emery, and that he has offered no evidence of actual damage. For the same reasons as claim III, the damage element is inadequately supported here. The motion will be **GRANTED** as to Count IV.

CONCLUSION

"[A] trial judge may use summary judgment procedures to require a plaintiff, who has had ample time for discovery, to show that [he] has some admissible

35

evidence to support an essential element of [his] case." *Catrett v. Johns-Manville Sales Corp.*, 756 F.2d 181, 187 (D.C. Cir. 1985) *rev'd sub nom. Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (Bork, J., dissenting). Emery has failed to do this.

The motion for summary judgment will be **GRANTED**. A separate final judgment order will be entered.

      **DONE** and **ORDERED** this 8th day of March, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge